THE HONORABLE TANA LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KEITH D. FREERKSEN,<br>Defendant. | No. CR24-086-TL<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

Keith Freerksen, through Assistant Federal Public Defender Dennis Carroll, asks this Court to follow the recommendation of the parties and Probation Department and impose a 20-year sentence. The joint recommendation was part of a global plea agreement between the parties in this district and the county prosecutor in Van Buren County, Michigan. The resolution disposed of the two cases in a way that did not require the minor victim to testify or participate in a defense interview. The resolution requires Mr. Freerksen to serve his sentence in federal prison where he will seek sex offender treatment and drug treatment. As a pretrial inmate at the FDC SeaTac, he is already participating in the Non-residential Drug Abuse Program and mental health counseling. Ex. 4 (FDC Records, filed under seal).

A twenty-year sentence appropriately reflects the seriousness of the offense. During the time-period that Mr. Freerksen was in contact with the victim, he genuinely cared for her. After reading the victim's interview with law enforcement, he recognized that he had a distorted and self-serving view of his conduct. He sincerely hopes the victim gets the help she needs and can put this chapter of her life behind her. Similarly,



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

he recognizes the victim's parents and relatives suffered unimaginable stress and he wishes only the best for them as well.

The advisory guideline is far higher than the parties expected during plea negotiations. This is due, in part, to the fact that Mr. Freerksen admitted facts beyond the offense conduct to which he pled guilty, resulting in using a guidelines cross-reference that led to a higher base offense level than anticipated. The parties and Probation Department agree that the advisory range suggests a sentence that is greater than necessary to achieve the goals of sentencing.

Since his arrest, Mr. Freerksen has had time to consider his conduct and thinking errors. His remorse and positive attitude toward treatment services and willingness to take responsibility support the joint recommendation.

Mr. Freerksen's history includes mitigating factors that also support the joint recommendation. Growing up, his parents were largely absent due to their own relationship problems and alcohol abuse. Not surprisingly, Mr. Freerksen developed substance abuse issues at a young age. He suffered from ADHD and depression, and, twice, came close to committing suicide. He was also sexually abused as a minor by two older individuals.

Finally, Mr. Freerksen will face an indeterminant sentence in Michigan. According to the Michigan plea agreement, the parties will recommend a concurrent 15-year *minimum* term of custody. Ex. 3 (Van Buren County Plea).

## I. PROCEDURAL HISTORY

Mr. Freerksen was arrested in Van Buren County, Michigan, on January 31, 2024. He was charged in Van Buren County with multiple counts related to this case and he was detained.

On March 25, 2024, Mr. Freerksen was charged by complaint in this district with travel with intent to engage in sexual act with minor. Dkt. 1. Mr. Freerksen was brought



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

to this district and had an initial appearance on May 3, 2024, where he was detained. Dkt. 8. On May 15, 2024, he was charged by indictment with the same offense charged in the complaint. Dkt. 13.

On November 8, 2024, Mr. Freerksen pled guilty to a two-count superseding information charging him with travel with intent to engage in a sexual act with a minor, and enticement of a minor. Dkt. 33.

On December 23, 2024, Mr. Freerksen appeared by teleconference in the Van Buren County case and pled guilty to three counts: criminal sexual conduct in the first degree, criminal sexual conduct in the third degree, and children-accosting for immoral purposes. Ex. 3. The state, in that case, will recommend a minimum term of 15 years to run concurrent with this case.[1] *Id*. Sentencing for the Michigan case is scheduled to take place by teleconference immediately following sentencing in this case.

## II. A 20-YEAR TERM OF IMPRISONMENT IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs district courts to impose a sentence sufficient*, but not greater than necessary*, to accomplish the purposes of sentencing. In other words, a court must impose the minimum term necessary to comply with the goals of sentencing. *Id.*; *accord* 18 U.S.C. § 3582.

### A. Mr. Freerksen's history and characteristics.

Mr. Freerksen, age 31, grew up as an only child in a working-class family. PSR ¶ 58. His father, a carpenter, was marginally employed and his mother, who was a housecleaner, primarily supported the family. *Id.* Although both parents were

[1] The PSR does not reflect that the plea in the Van Buren case has already taken place. *See* PSR ¶ 54. Counsel requests that the PSR be amended to reflect the plea and sentencing in the Van Buren County case so that the BOP does not consider the case unresolved when calculating Mr. Freerksen's custody level.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

employed, they still struggled to provide the family with basic needs. *Id*. His parents both struggled with alcohol and marijuana, which contributed to their stormy relationship that ended in divorce when he was 14 years old. PSR ¶ 59, 63.

Growing up, Mr. Freerksen spent much of time in day care or alone. His mother's work kept her away from the house regularly; his father was largely absent; and both parents abused alcohol and marijuana. When the family took the rare trip together, his parents constantly argued.

Growing up, Mr. Freerksen suffered from ADHD which caused him to struggle both academically and socially at school. He also started using alcohol and marijuana, both of which he would take from his parents, at about age 12. PSR ¶ 62. While in middle school, an older male tried to force Mr. Freerksen to engage in sexual activity. Over time, the individual made repeated attempts to abuse Mr. Freerksen. Eventually, the older male stopped after Mr. Freerksen repeatedly resisted the attempts at sexual contact. PSR ¶ 61. In somewhat similar situation to this case, when Mr. Freerksen was 14 years old, he had a "consensual" sexual encounter with a woman who was about 28 years old. *Id*. This encounter undoubtedly influenced his views about "consensual" sexual relationships with minors.

At 15, Mr. Freerksen was struggling at home and school. His parents divorced when he was about 14 years old and he lived with his mother. At one point, he was so depressed, he considered jumping off the roof of his house. PSR ¶ 78. He eventually was diagnosed with ADHD and was prescribed medication. PSR ¶ 62.

The medication, and the calmer home-life, let Mr. Freerksen do well in high school where he developed a social network. However, he was largely left to his own devices and sold marijuana, causing him to associate with friends who consumed drugs and alcohol and engaging in sex. Ex. 1 (Mr. Freerksen's Letter to the Court).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

After graduating from high school, Mr. Freerksen moved to Florida to attend college where he studied sound engineering. PSR ¶ 64. However, he was socially isolated in Florida and consumed "an unhealthy amount of porn" which continued after he graduated from college and started working. Ex. 1. Eventually, he started viewing child pornography, which led to his conviction and three-year imprisonment for possessing child pornography, his only prior criminal conviction. *Id.*; PSR ¶ 50.

While in custody, Mr. Freerksen received no treatment or even supervision upon release from prison. *Id*. He had to register as a sex offender and had to rely on the support of his family, so he moved back to Michigan to live with his father. *Id*. He was depressed, isolated, lonely, and marginally employed. During this time, he met the minor victim online.

Mr. Freerksen's parents and a friend have submitted support letters on his behalf. Ex. 2 (Letters of Support). They describe him as a hard-working and sincere person who regrets his actions and is remorseful for the harm he has caused. *Id*. The Probation Department expresses concerns about his father's attitude regarding the offense conduct. His parents, though not elderly, obviously love their son and try to see his circumstances in a favorable light. It is unlikely that they will be able to provide much support to him when he is eventually released from prison after serving a 20-year sentence. Importantly, they speak to Mr. Freerksen's remorse and, apart from this offense, he is a respectful and caring person.

**B. The seriousness of the offense supports a 20-year sentence.**

Mr. Freerksen makes no excuses for his behavior and recognizes the seriousness of his conduct. He understands the seriousness of the offense and the negative impact it had upon the victim and her family. As he outlines in his letter to the Court, when he was getting to know the victim, he was genuinely looking for connection and companionship. Ex. 1. At one point, he took steps to take his own life because he was



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

so depressed. *Id*. He made plans and sent her a vague goodbye message. *Id*. She called him and talked him out of it, spending hours on the phone with him. *Id*. Since his arrest, Mr. Freerksen has given a great deal of thought to the impact his actions have caused to the victim and her family. *Id*. He understands that even asking for forgiveness is selfish; he knows he irreparably harmed the victim and her family and there is no reason for them to forgive him. *Id*. Instead, he promises to continue to work on himself to make sure he never acts this selfishly again. *Id*.

**C. A sentence greater than fifteen years is not necessary to protect the public.**

A twenty-year sentence means Mr. Freerksen would be released, at the earliest,[2] at about 47 years old with good time. By that age, his risk of recidivism will be greatly diminished. Many studies have found that recidivism rates for sex offenders decline as offenders get older. For example, a meta-analytic review completed by Hanson and Bussière (1998) of 61 recidivism studies of sexual offenders (N=23,393) found that the sexual recidivism rate for the sample was relatively low (i.e., 13.4%), and that age at release was inversely related to sexual recidivism risk. Similar results have been obtained by other more recent studies. *See, e.g*., Barbaree, Blanchard, & Langton, 2002; Fazel, Sjostedt, & Langstrom; 2006; Packard, 2002; Prentky & Lee, 2007.

Here, there will be multiple safeguards in place to assure that Mr. Freerksen is not released while he poses a significant risk of recidivism. He will first be subject to review by the BOP to determine if he is eligible for civil commitment as a sexually dangerous person. After he is ultimately released from custody, he will be subject to supervision by U.S. Probation and Pretrial Services for an exceptionally long period. Mr. Freerksen requests that this Court impose a 20-year term of supervised release. If he successfully completes a long 20-year term of supervised release, he will be well

---

[2] The Michigan sentence will be indeterminant.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

over the age of 60 and further supervision would not be needed. If he should violate the conditions of supervised release the Court could simply impose an additional term or a lifetime term of supervision.

**D. The advisory guideline range is unreasonably high and should be rejected.**

Mr. Freerksen does not object to the technical guideline calculation in the Presentence Report. However, based on the joint recommendation of the parties and the global resolution of this case, the parties and Probation Department agree the advisory range is unnecessarily long.

Of particular concern is the upward adjustment under USSG § 4B1.5(b) for engaging in a "pattern of activity involving prohibited sexual conduct." This enhancement technically applies because Mr. Freerksen engaged in sexual contact with the victim on more than one occasion during the course of this offense. The repeat and dangerous sex offender enhancement does not exemplify the Sentencing Commission's characteristic institutional role and the Court should therefore afford it less weight.

Congress has tasked the Sentencing Commission with "writ[ing] Guidelines that will carry out th[e] . . . objectives" in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). That statute seeks to ground sentencing decisions in consideration of the sentencing factors in 18 U.S.C. § 3553(a). *Id*. at 347–48.

To meet these goals, the Commission began the Guidelines-promulgation process with "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Id*. at 349. The Commission then "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Id*. In doing so, the Commission "base[d] its determinations on empirical data and national experience,



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

Issuance of the resulting Guidelines did not mark the end of the Commission's "empirical approach." *Rita*, 551 U.S. at 349. Rather, "[t]he Commission's work is ongoing," and the Guidelines undergo "continuous evolution." *Id*. at 350. As district courts provide explanations for imposing non-Guidelines sentences and circuit courts subject those explanations to reasonableness review, the Commission "collect[s] and examine[s] the results," using this trove of data to "revise the Guidelines accordingly." *Id*. at 350. The Commission also "obtain[s] advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others," all in an effort to determine whether—and ensure that—the Guidelines are serving the "§ 3553(a) objectives." *Id*. at 348, 350.

It is because of this ongoing, empirical, consensus-driven process that, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109. But not all guidelines result from this technocratic process. In a handful of cases, the Commission has based guidelines not on "empirical data and national experience," but on statutory directives from Congress. *Id*. at 109. The guideline governing cocaine offenses, for example, treats crack substantially more harshly than powder only because Congress has dictated this treatment through mandatory minimum sentences. *See id*. at 96–100, 109. The Supreme Court has recognized that because guidelines of this type "do not exemplify the Commission's exercise of its characteristic institutional role," they are less likely to further "the purposes of sentencing set forth in § 3553(a)." *Id*. at 109–10. And as a result, a district court need not afford those guidelines as much weight or as much deference as it would guidelines that result from the Commission's normal data-driven procedures. *Id*.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

This Court should view USSG §4B1.5(b), which applies a five-level enhancement when a defendant engages in a pattern of activity involving prohibited sexual conduct, with skepticism. As history shows, §4B1.5(b) does not "exemplify the Commission's exercise of its characteristic institutional role" particularly where the enhancement applies whether or not there are multiple victims, a prior conviction, or even arrests for qualifying offenses.

In 2001, the Commission added §4B1.5(b) but required at least two victims.[3] Then in 2003, Congress directly amended application note §4(b)(i) to §4B1.5 to read:

> (i) IN GENERAL.—For purposes of subsection (b), the defendant engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor.[4]

The §4B1.5 commentary reflects this change, noting that "Section 401(i)(1)(A) of [the Protect Act] directly amended Application Note 4(b)(i)." *Id*. cmt. n. background. The current guideline therefore applies if, "on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor," even if the minor was the same person for each "occasion." §4B1.5 cmt. n.4(B)(i). Thus, in writing §4B1.5, the Commission could not "provide[] some insulation from the distorting pressures of politics," as it was intended to. *See U.S. v. Zauner*, 688 F.3d 426, 430 (8th Cir. 2012) (Bright, J., concurring). As far as counsel is aware, Congress has never, in any other context, directly amended the commentary to a guideline. *See* 2009 Report at 38 (noting that, as of 2009, the Protect Act represented "the first and only time to date" that Congress had "directly amended the guidelines"). This unprecedented interference with the Commission's work disentitles §4B1.5 to the solicitude that courts normally afford the Guidelines.

---

[3] USSG App. C, amendment 615 (Nov. 1, 2001).
[4] *See* USSG App. C, amendment 649 (April 30, 2003).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Thus, it was Congress, and not the Sentencing Commission, that added the five-level enhancement and then determined that it should not require two different victims or a past conviction or arrest. Because the changes Congress dictates are not grounded in any scientific, statistical or empirical method, this Court should afford it little weight.

Applying a recidivist enhancement so broadly is inconsistent with the general theory of recidivist sentencing enhancements, i.e., someone who has reoffended even after being punished for a past offense must be incapacitated or subjected to more substantial specific deterrence, since prior punishments were evidently not enough to change his conduct. This theory is reflected in virtually every other recidivist sentencing enhancement in federal law. For example, the career offender guideline, the Commission's primary tool for punishing recidivists more harshly, requires that "the defendant ha[ve] at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG §4B1.1(a). Likewise, the Armed Career Criminal Act, which the Commission has incorporated into §4B1.4, applies only if a defendant "has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1).

This Court has the "authority to vary from the [sentencing] guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009). The Court's authority is not limited to the crack guidelines at issue in *Spears*. Rather, "[w]e understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any guideline on policy grounds – though they must act reasonably when using that power." *Henderson*, 649 F.3d at 960 (quoting approvingly *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010)).

The conclusion that the advisory guideline range in this case is unusually harsh is easily shown by comparing it to the guideline range for other, more serious, offenses.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

For example, had Mr. Freerksen committed first-degree murder, his total offense level would be the same, 40, after a three-level reduction for acceptance of responsibility. *See* USSG §2A2.1. For the crime of committing rape resulting in permanent or life-threatening bodily injury, his offense level would be lower, 34. *See* USSG §2A3.1(a)(2), (b)(4)(A). To punish Mr. Freerksen the same as if he had committed premeditated murder does not square with common sense and is unreasonable.

## III. CONCLUSION

A twenty-year sentence is a substantial term of imprisonment that adequately addresses the sentencing factors in 18 U.S.C. § 3553(a). Also, as requested by the parties in the plea agreement, the sentence should run concurrently with the sentence imposed in Van Buren County, Michigan, Cause Number 24000110FY, and with credit beginning from his arrest on January 31, 2024.

Mr. Freerksen also requests a judicial recommendation for placement at FCI Marion, a BOP facility in Illinois that has both a residential and non-residential sex offender management program. If not designated to FCI Marion, Mr. Freerksen requests a recommendation for placement at FCI Petersburg or FCI Marianna, both of which have sex offender treatment programs.

Respectfully submitted this 29th day of January 2025.

s/ *Dennis Carroll*
Assistant Federal Public Defender
Attorney for Keith Freerksen



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**